*Sheila Caldwell v. Marquita Sharrice Sutton*, No. 424, September Term, 2022.  Opinion by Graeff, J.

**FAMILY LAW – CHILD CUSTODY – THIRD-PARTY CUSTODY OF CHILD – *DE FACTO* PARENTHOOD – CONSENT TO FORMATION AND ESTABLISHMENT OF PARENT-LIKE RELATIONSHIP WITH CHILD – "GOOD CAUSE" TO AWARD CUSTODY PURSUANT TO MD. CODE ANN., FAM. LAW ART. § 9-101.2**

A court order granting custody to a third party, by itself, does not terminate the biological parent's parental rights or give the third party status as a legal parent in a subsequent custody dispute.

When a legal parent, who consented to custody while the parent was in jail, is released and desires to regain custody, the trial court did not err in finding a material change in circumstances.

Md. Code Ann., Fam. Law Art. ("FL") § 9-101.2(a) (2019 Repl. Vol.), provides that "a court may not award custody of a child or visitation with a child" to a parent who has been found "guilty of first degree or second degree murder of the other parent of the child," "unless good cause for the award of custody or visitation is shown by clear and convincing evidence."  In this context, "good cause" means a substantial reason to find that it is in the child's best interests to return to the parent's custody.  The trial court did not abuse its discretion in finding good cause where Mother, who had been found guilty of murdering her husband and the father of her child, had no prior convictions, there was no evidence that she had committed any acts of violence or aggression since the murder, her motivation for committing the murder stemmed from years of physical and sexual abuse at the hands her husband, she had taken concrete steps to rebuild her life, she had complied with the terms of her probation, and she genuinely wanted to be with her son.

If a legal parent consents to a parent-like relationship between a child and a third party, a court may find, even if the parent subsequently opposes the grant of *de facto* parenthood status, that such status is shown if all factors of the test set forth in *Conover v. Conover*, 450 Md. 51 (2016), are satisfied.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 424

September Term, 2022

_____

SHEILA CALDWELL

v.

MARQUITA SHARRICE SUTTON

_____

Wells, C.J.,
Graeff,
Arthur,

JJ.

_____

Opinion by Graeff, J.

_____

Filed: November 30, 2022

*Albright, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

This appeal involves a custody ruling by the Circuit Court for Montgomery County. Marquita Sutton ("Mother"), appellee, filed a motion to modify custody and visitation of her son ("Child"), who had been placed in the legal and physical custody of her mother, Sheila Caldwell ("Grandmother"), appellant, after Mother killed her husband and Child's father ("Father"). The court found that there had been a material change in circumstances justifying a modification of custody, and there was good cause pursuant to Md. Code Ann., Fam. Law Art. ("FL") § 9-101.2 (2019 Repl. Vol.), to permit an award of custody to Mother, a parent found guilty of murdering Child's other parent.[1] The court further found that Mother was a fit and proper person to have custody of Child, that exceptional circumstances did not warrant awarding custody to a third party, that Grandmother was not a *de facto* parent, and that it was in Child's best interest for Mother to be awarded sole legal and sole physical custody of him, with a three-month graduated transition period for the change in physical custody.

---

[1] Md. Code Ann., Fam. Law Art. ("FL") § 9-101.2(a)(1) (2019 Repl. Vol.), provides, in pertinent part, as follows:

> [U]nless good cause for the award of custody or visitation is shown by clear and convincing evidence, a court may not award custody of a child or visitation with a child . . . to a parent who has been found by a court of this State to be guilty of first degree or second degree murder of the other parent of the child, another child of the parent, or any family member residing in the household of either parent of the child.

On appeal, Grandmother presents four questions for our review,[2] which we have consolidated and rephrased, as follows:

1.      Did the circuit court err or abuse its discretion in modifying custody to grant Mother sole legal and physical custody of Child?

2.      Did the circuit court err by ordering Grandmother to pay for reunification therapy and monitored exchanges?

For the reasons set forth below, we conclude that, although the court was correct in portions of its analysis, it erred in one aspect of its analysis of the custody issue. Specifically, the court erred in finding that Grandmother failed to show that she was a *de facto* parent. Therefore, we shall affirm, in part, and vacate, in part, the judgment of the circuit court and remand for further proceedings.

---

[2] The questions presented by Grandmother are as follows:

1.      Did the court err by considering evidence that predated the last controlling custody order?

2.      Did the court err by failing to recognize Appellant's previously established parental and custodial status?

3.      Did the court err by awarding Appellee sole legal and sole physical custody?

4.      Did the court err by ordering Appellant to pay for reunification therapy and monitored exchanges?

2

## I.

### Events Leading to Award of Custody to Grandmother

On December 12, 2013, when Child was 21 months old, Mother fatally stabbed Father more than fifty times at their home in Odenton, Maryland. Child was in the home, but he did not witness the stabbing. Mother took Child to Grandmother's house and surrendered to the police. She subsequently was charged with first-degree murder and held without bail pending trial.

On December 20, 2013, Grandmother filed an emergency complaint for custody of Child, alleging that Mother could not provide him with protection or a stable home because she was incarcerated and awaiting trial for Father's murder. Ten days later, the circuit court granted Grandmother temporary sole legal and physical custody of Child.

On September 17, 2014, while Mother was in custody and awaiting trial, she signed a form consenting to Grandmother having sole legal and physical custody of Child, stating that it was in Child's best interest for Grandmother to become his custodian. The form stated that Mother had the right to withdraw her consent prior to the time the court granted custody.

On December 19, 2014, the circuit court held a custody hearing. Mother was not present at the hearing. That same day, the court issued an order granting Grandmother sole

legal and physical custody of Child. It further ordered that Mother "shall have reasonable access to the child within [Grandmother's] discretion."[3]

## II.

### Mother's Murder Conviction and Sentence

On September 8, 2015, Mother entered an *Alford* plea to second-degree murder.[4] The court sentenced her to 30 years' incarceration, all but ten years suspended.

While imprisoned, Mother maintained contact with Child, speaking to him by telephone approximately once a month, seeing him in person "at least once a year," and sending him cards and gifts. She also took numerous parenting and therapeutic classes.

In 2019, after hearing evidence from witnesses and domestic violence experts, the circuit court modified Mother's sentence. On August 16, 2019, Mother was released from prison. At that time, Child was seven years old.

## III.

### Mother's Complaint to Modify Custody

Upon her release, Mother initially was allowed access to Child, usually at the apartment of her maternal aunt, Tanya Glover. Within months, however, Grandmother restricted her access and conditioned it upon Mother providing proof that she was

---

[3] The caption of the order misidentified Mother as the plaintiff and Grandmother as the defendant. The court entered a corrected order on February 4, 2015.

[4] An *Alford* plea takes its name from *North Carolina v. Alford*, 400 U.S. 25 (1970), and is a "guilty plea containing a protestation of innocence." *Bishop v. State*, 417 Md. 1, 19 (2010) (citations omitted).

completing community service hours under the terms of her probation, seeking employment, and receiving appropriate mental health therapy.

On February 24, 2020, six months after her release, Mother moved to modify custody, seeking shared legal custody and a visitation schedule. She alleged that Grandmother was denying her access to Child.

On October 8, 2020, Mother filed an amended complaint for modification of custody, requesting sole legal custody and shared physical custody of Child, with increasing access until Mother regained sole physical custody. She alleged that, since the beginning of the COVID-19 pandemic in March 2020, Grandmother had permitted Mother to see Child in person only three times, and she limited the visitation to one hour. Mother alleged that her release from incarceration, which restored her ability to parent Child, constituted a material change in circumstances.

On January 25, 2021, the court ordered a visitation evaluation. The next day, Mother requested a *pendente lite* hearing on the issue of visitation.

Following an April 6, 2021, *pendente lite* hearing, the court ordered Grandmother to make Child available for supervised visitation with Mother at her home on alternating Saturdays from 12 p.m. until 2 p.m. and every Wednesday from 5 p.m. until 7 p.m. The visits were to be supervised by Supervised Visitation and Investigations, LLC, a private visitation supervision firm. Mother was ordered to pay for this service. Mother also was permitted to have FaceTime contact with Child on Mondays and Fridays.

On October 20, 2021, the court issued an order, which it subsequently amended, referring Mother to the Supervised Visitation Program operated by the Family Division of

5

the circuit court. Under the terms of the amended order, Mother was entitled to weekly access with Child for between 45 and 60 minutes, as scheduled through Family Division Services. The court later clarified that that order superseded the access provisions of the *pendente lite* order.

## IV.

## The Merits Hearing

On February 2, 3, and 24, 2022, the circuit court held a merits hearing on Mother's amended complaint to modify custody. At that time, Child was one month shy of ten years old.

## A.

## Merits Hearing: Day One

Mother testified, over objection, about the abuse she suffered during her relationship with Father and the circumstances of his murder.[5] Father, who worked in intelligence services for the United States military, threatened to kill her, threatened to keep her away from Child, and threatened her with a weapon on four occasions. She sought medical attention on three occasions after Father punched her in the face. On the first occasion, he broke one of her teeth; the second time she lost consciousness and was "seeing spots"; and the third time she sustained bruising and swelling and again saw "spots." Mother called the police three or four times during their relationship, filed for a protective order on one occasion, and sought assistance from the military. The military "red flagged" Father, asked

---

[5] We will discuss Grandmother's objections to this testimony later in this opinion.

6

him to move out of the house, and enrolled the family in counseling. Mother explained that she was scared to leave because Father tracked her phone and her vehicle.

Mother introduced into evidence photographs taken in June 2013, six months prior to the murder, showing injuries to her face caused by Father "hit[ting her] repeatedly in the face after an argument." The photographs depict bruising and swelling around Mother's eye and broken blood vessels in the white of her eye. She also introduced into evidence a text message that Grandmother sent to her after that incident expressing distress about Mother's injuries and advising Mother not to accept Father's apologies or take him back. She warned Mother that it "will only get worse until . . . ."

On December 12, 2013, Father became angry because he thought Mother was viewing photographs of her June 2013 injuries on her computer. They were in the bedroom, and he tried to force her to engage in anal sex with him. Mother attempted to run out of the room, but he blocked her and burned her with candle wax. She grabbed his army knife off the bedside table and began stabbing him. She did not know how many times she stabbed him until the police told her.

Before Mother turned herself in, she took Child to Grandmother's home. Grandmother took Mother to the hospital and hired a lawyer for her. Mother testified that she decided to enter an *Alford* plea because she wanted to "take responsibility for [her] role in what happened" and to "make sure that [she] would be able to get back home to [her] son."

While incarcerated, Grandmother or Mother's aunt brought Child to visit her "at least once a year," and she spoke to him by telephone once or twice every month. Mother sent Child cards and presents for holidays.

After her release, Mother complied with the conditions of her probation. She began therapy during incarceration and continued after her release. She met with her therapist weekly. Mother explained that she was processing her traumatic past, both during her childhood and in her relationship with Father.[6]

Mother had been living in a one-bedroom apartment in Silver Spring for almost a year. She had furnished a den in the home as Child's bedroom. She worked full-time at an engineering firm and ran a small catering business on the side. She was in a serious relationship with someone who lived in Virginia.

When Mother initially was released from prison, she visited Child routinely with Grandmother or at her aunt's apartment. That changed at the end of September 2019, after Grandmother sent Mother a "list of demands" by text message. Grandmother told Mother not to contact her about visits with Child until she obtained a job and made progress on her community service hours, which were a condition of her probation. During an

---

[6] Mother testified that Grandmother used physical discipline on her when she was a child, choking her and beating her with a belt. She was disciplined "very frequently." In her testimony, Grandmother did not recall ever choking Mother but acknowledged that she used a belt on Mother. Grandmother testified that it was an "era" when physical discipline was acceptable, but she now understands that this form of discipline is not appropriate. She did not use physical discipline with Mother's younger half-sister, L.F., or Child. L.F. confirmed this in her testimony.

approximately 19-month period before the court entered the *pendente lite* order, Mother saw Child 15 times or less, never for more than 2 hours.[7]

After the COVID-19 pandemic began in March 2020, Grandmother restricted visitation further because of concerns about transmission of the virus. Mother testified that she was not permitted to see Child in person for Easter, Mother's Day, her birthday, Halloween, or Thanksgiving in 2020 and only was allowed a 45-minute visit on Christmas Day 2020, in the hallway of Grandmother's apartment building.[8] Similarly, in 2021, Mother was not permitted to see Child in person for Easter, his birthday, or Christmas.

Mother spoke to Child on Christmas Day in 2021 and learned that he had COVID. Grandmother had not shared that information with her. Mother testified that Grandmother never shared any of Child's medical or educational records with her. She learned for the first time during the *pendente lite* hearing that Child was in therapy.

In early 2021, Grandmother accused Mother of plotting Father's murder. This was the first time Grandmother had ever made such a statement to Mother. The accusation was made after Grandmother abruptly ended a telephone call between Mother and Child after she overheard Mother telling Child that she hoped that they could "see each other soon."

On cross-examination, Mother was asked about an incident in 2012 when she was charged with first-degree assault of Father. Mother explained that she had barricaded

---

[7] Mother testified that the one exception was when Child stayed with Mother's paternal grandmother after Christmas in 2019, and Mother stayed there as well. That was the only overnight visit Mother had with Child after her release from prison.

[8] As we shall discuss, *infra*, this visit was unannounced.

9

herself inside their home, blocking the door with chairs, because she was fearful of Father. He nevertheless "burst through the door." When he reentered the home, Mother grabbed his phone, ran onto the balcony, and threw the phone over the railing. When Father ran onto the balcony, Mother closed the balcony doors and locked him outside. She then called 911. When Father attempted to break the glass doors and reenter the home, Mother grabbed a knife and threatened Father with it.

Mother denied ever speaking to anyone about wanting to have Father killed. She acknowledged that her uncle had offered her morphine to give to Father, but she stated that it was offered to allow her and Child to leave Father. She was not comfortable using morphine against Father. She also acknowledged that she used a stun gun against Father on the night of the murder, explaining that she tried to try to stop Father's assault on her, but it was ineffective, and he knocked it out of her hand.

Mother called her close friend, Ramim Ber Arar, as a character witness and to corroborate her allegation that Father abused her. Ms. Ber Arar testified remotely from Germany, where she lived. She testified that Father often followed Mother around when he was not with her. On one occasion in 2010, Mother drove Ms. Ber Arar to McDonalds, and Father pulled up next to their car on the road. He "pulled out a gun and rolled his window down and just said hi" to Ms. Ber Arar. When Mother drove away, Father sped after them and blocked her car. Mother drove around Father's car and Ms. Ber Arar called the police. The dispatcher told her that Mother should drive to the nearest gas station and wait there for the police to arrive, which they did. They then "went to a safe place."

Ms. Ber Arar described Mother as "the sweetest person on earth," loyal, and warm. In her view, Mother was a fit and proper person to have custody of Child.

On cross-examination, Ms. Ber Arar acknowledged that she had not seen Mother in person since 2011, when Mother and Father moved back to the United States. She had never met Child in person. She communicated with Mother daily, however.

Two other witnesses testified about Mother's character. Tillena Bullock, an adjunct professor at the Community College of Baltimore County ("CCBC"), met Mother during her incarceration while teaching life skills and conflict resolution courses at the Jennifer Road Detention Center. She described Mother as loving and caring with the other prisoners and a leader and a mentor for them. Ms. Bullock also taught courses at the Maryland Correctional Institution for Women and saw Mother twice a month after Mother transferred to that facility.

After Mother's release, Ms. Bullock asked her to give guest lectures at CCBC about the judicial system, her experience in prison, and domestic violence. Ms. Bullock spoke highly of Mother, characterizing her as kind, resilient, dedicated, and loving. She believed Mother would be a fit and proper person to have custody of Child. On cross-examination, Ms. Bullock acknowledged that she had never observed Mother and Child together in person.

Mother's partner, Delores Boyd, testified that she and Mother had been in a relationship for two years. She lived in Virginia but arranged to spend time with Mother every week. She had observed Mother interact with Child on the phone frequently. Ms. Boyd had never heard Mother make an inappropriate remark to Child or discuss the custody

11

dispute with him. She had no concern about Mother's mental health and had never observed her exhibit violent or aggressive behavior. Ms. Boyd was comfortable letting Mother spend time with her grandchildren, who were three months and four years old.

Ms. Boyd also testified about a February 21, 2021 FaceTime interaction with Mother and Child that she observed. She heard Mother tell Child that she was "working hard so that they could see each other" and that "she loved him." Grandmother interjected: "[W]hat did you say to him?" Grandmother became upset and told Mother that she cannot say that to Child and that she needed to have those conversations directly with Grandmother. Mother clarified that she meant that she would be able to get vaccinated soon and then it would be safe for her to see Child in person.

Grandmother responded that she did not have to allow Mother to speak to Child if Mother would not "abide by [her] rules," and they were "in this situation because [Mother] decided to execute [Father]." Grandmother then stated that Child was in her custody because Mother "decided to plot, plan, and kill his father." Mother asked Grandmother not to speak about the circumstances of Father's death with Child in the house. Grandmother then screamed repeatedly at Mother that she had "killed his father" and hung up. Grandmother sounded like she was "losing control."

Mother called three witnesses who had supervised visits between her and Child between 2019 and 2022. Leslie Foster worked with Mother for a year as part of an internship at the University of Maryland School of Social Work. She met Mother shortly after her release from prison, in September 2019, and supervised a visit at a pumpkin patch between Mother and Child in October 2019. According to Ms. Foster, Mother's love for

Child was apparent. Child was "very receptive" and thrilled to be with Mother. Child was tearful on the way home from the visit and somber. He asked when they would be able to spend a "long time" together again.

Ms. Foster described Grandmother as difficult and demanding of information about Mother, including about her mental health treatment. After Ms. Foster supervised the October 2019 visit, Grandmother did not respond to her inquiries about scheduling another visit. Ms. Foster had no reservations about Mother's parenting.

Maeve McGrath, who supervised some of Mother's visits with Child under the original *pendente lite* order from May 19, 2021, through October 2021, testified that Mother was very interactive with Child, attuned to his needs, loving, and affectionate. She also displayed patience with him and was supportive when he spoke about Grandmother. During her observations, Ms. McGrath never observed any behavior by Mother that concerned her.

Ms. McGrath ceased supervising visits after the court entered the amended *pendente lite* order referring Mother to court supervised visits. Mother's counsel, however, had reached out to see if Ms. McGrath could supervise a Christmas Day visit in 2021. Ms. McGrath was available to supervise the visit, but Grandmother did not consent to the visit because it was not required under the terms of the court order.

Stephanie Hess worked for the circuit court and supervised court ordered visits between Mother and Child after the amended *pendente lite* order was entered. She testified that she did not have any concerns about Mother's fitness to parent Child based upon her observation of three visits between November 2021 and January 2022.

13

Mother's former criminal attorney, Thomas Stovall, testified about his interactions with Grandmother after mother was arrested. He recalled meeting with Grandmother on several occasions. Her focus during those meetings was on the benefits that Child would be eligible to receive through the military and how she could secure custody of Child. Mr. Stovall did not recall Grandmother asking any questions about Mother's criminal case.

At the conclusion of Mother's case, the court questioned her briefly on the record. Mother testified that her relationship with Child was joyful and playful, but she was mindful of maintaining her role as his mother because it was "easy for him to see [her] as a playmate because [she was] not part of his life all the time." She gave him responsibilities when he was with her, like helping with the dishes and normal childhood chores.

**B.**

**Merits Hearing: Day Two**

On the second day of trial, Grandmother presented her case, beginning by recalling Mother as a witness. Mother testified that she asked Grandmother to care for Child before she turned herself in to the police in 2013. She acknowledged that she was aware that Grandmother filed a complaint for custody of Child and that there was a hearing on her complaint that Mother did not attend. She identified the document that she signed consenting to Grandmother having sole legal and physical custody of Child, and it was admitted in evidence.

Grandmother called two witnesses who testified that Mother planned to kill Father and asked for their help. Kenneth Glover, Mother's maternal uncle, testified that, in Fall 2013, Mother told him that she wanted Father "gone." He offered Mother morphine, which

14

Mother accepted.  Several days later, Mother called and said it "didn't work."  She then asked if he knew anyone who "would do that for her."  Mr. Glover understood Mother to mean that she wanted to hire someone to kill Father.

Mr. Glover testified that, on the day after the murder, Mother showed up with Child at Grandmother's apartment.  She had brought all of Child's belongings.  She told Mr. Glover that she had killed Father the night before and asked him to "raise [Child]" because she was going to "flee the country."  She asked him to come back to her house with her to "finish cleaning up," but he refused.  He insisted that they call Grandmother, who was at work.  Mother waited at the apartment until Grandmother came home.

Eric Allen, Grandmother's romantic partner for 20 years, testified that Mother called him a few weeks before the murder and asked him to meet with her.  They met in a parking lot, and she was acting strangely and shaking.  She told him what was going on between her and Father, which Mr. Allen said was shocking.  Mother asked Mr. Allen if he or someone he knew could "get rid of" Father.  She said she could pay someone.  Mr. Allen called Grandmother and told her what Mother asked him.  The court confirmed through its questioning that neither Mr. Glover nor Mr. Allen ever reported Mother's alleged statements to the police, either before or after Father's death.

Mr. Glover and Mr. Allen also testified that Grandmother was loving and patient with Child and was a fit and proper person to have custody of him. Mr. Glover had lived with Grandmother and Child from 2013 until December 2020.  He reported that Child called Grandmother "mommy."  Mr. Glover had seen Mother several times since her

release, but they did not have much to say to each other due to the tension between her and Grandmother over custody of Child.

Grandmother's older sister, Ms. Glover, also testified as a character witness for Grandmother. She lived in the same apartment building on the same floor as Grandmother. She visited Grandmother approximately twice a week, and Grandmother visited her once a week. She cared for Child frequently when Grandmother was unavailable. Child was intelligent, happy, well-disciplined, and appreciative. She had observed Grandmother caring for Child since Mother's arrest and all his needs were being met. Their relationship was loving and affectionate. When Child misbehaved, Grandmother imposed consequences, such as taking away his access to his iPad or video games. She never observed Grandmother physically discipline Child. Ms. Glover believed with her "whole heart" that Grandmother was a fit and proper person to have custody of Child. Ms. Glover testified that she had no relationship with Mother anymore.

On cross-examination, Ms. Glover testified that she had facilitated visits between Mother and Child during Mother's incarceration and after her release. Ms. Glover acknowledged an incident prior to Father's death when Mother came to her apartment wearing sunglasses. When Mother removed the glasses, she had a black eye and began crying. She begged her aunt not to call the police, saying that it would "ruin Father's Day" for Father. In the aftermath of that incident, Ms. Glover recommended that Mother leave Father and stay in a shelter near her house.

The court asked Ms. Glover if Mother's behavior during visits with Child ever caused her concern. She replied that the visits were "brief," but that Mother never did anything that caused her concern.

Grandmother's younger daughter, Mother's half-sister, L.F., testified that she was in her final year of college in Ohio. Mother is 15 years older than L.F. L.F. described Grandmother and Child's relationship as very bonded and "average mother/son." L.F. described Grandmother as an amazing mom, who was always there for her.

L.F.'s relationship with Mother was "strained," and she had seen her infrequently since Mother's release from prison. She was present the day that Mother and Grandmother argued on the phone during a FaceTime visit between Mother and Child. Grandmother "grabbed the phone" after Mother said something to Child about "doing everything in [her] power . . . so [that they could] be together." According to L.F., Grandmother then had a conversation with Mother while L.F. took Child into another room.

Grandmother told L.F. that Mother had "lied about sexual allegations" pertaining to L.F.'s biological father. L.F. did not believe that Mother was a fit and proper person to have custody of Child.

Grandmother, who was 54 years old at the time of trial, testified that Mother called her a few months before Father's death and said she was "unhappy in her relationship" and "wanted him dead." Mother wanted Grandmother to ask Mr. Allen to murder him. Grandmother was shocked and refused to do so. She told Mother to leave Father, which she previously had suggested when Mother complained about him cheating on her. Grandmother later participated in a three-way call involving Mr. Allen and Mother, during

17

which she heard Mother ask Mr. Allen directly to help her to kill Father. Grandmother screamed at Mother to never call Mr. Allen again.

On December 12, 2013, Grandmother was at work when Mr. Glover called her and put Mother on the phone. Mother told Grandmother she "finally did it. . . . I killed him." Mother said that she needed to finish cleaning up at the house and asked Grandmother to go with her. She said that she was then going to leave the country. Grandmother came home and took Mother to the hospital, where she was treated for cuts on her hands and a dislocated shoulder.

Grandmother helped Mother retain Mr. Stovall, on a recommendation from a coworker. Grandmother asked Mr. Stovall about custody of Child because the military needed a custodian to receive his benefits and it could not be Mother.

In the first year of caring for Child, Grandmother took him to more than a dozen medical appointments. He required surgery in May 2014, and she and Mr. Glover stayed with him during the procedure. He later was diagnosed with attention-deficit hyperactivity disorder ("ADHD"), as well as post-traumatic stress disorder ("PTSD") and a development delay. He was seeing a child psychiatrist, a behavioral specialist, an ENT, and an audiologist.

After Grandmother was granted sole legal and physical custody of Child, she allowed Mother to see him. She brought him to see Mother at the detention center and later at the prison where she served her sentence. She also facilitated phone calls between them, but she noted that Child often had difficulty focusing on the calls.

Grandmother described Child as creative and "a great engineer." He was currently attending his zoned elementary school near Grandmother's home and was in the 4th grade. He was doing well in school, receiving mostly As and Bs. Grandmother worked closely with his teachers and attended his individual education plan meetings relative to his ADHD. Child had his own bedroom at Grandmother's apartment, though he had shared with L.F. when she lived at home.

Grandmother believed that she should retain custody of Child because he was her "heart" and her "world." He needed love and stability, and she had done everything in her power to give him both. She wanted him to grow up in an environment with "no drama."

Grandmother explained that Mother's release in August 2019 was unexpected and sudden. Since Mother's release, Grandmother had consulted with Child's behavioral specialist, who referred Child to a child psychiatrist in the summer of 2021. He had his first session in November 2021. Grandmother explained that she was not trained to help Child process the circumstances of Father's death and his relationship with Mother.

After Mother was released from jail, she broke rules during her visits with Child. Specifically, Mother took Child to a store during a supervised visit when the *pendente lite* order required the visits to take place at Mother's home, and she walked Child to Grandmother's car, although the *pendente lite* order required her to have no interaction with Grandmother. Additionally, Mother showed up at Ms. Glover's apartment in September 2020 and requested a visit with Child, which Grandmother allowed, but then Mother took off the mask she was wearing to protect Child from the possibility of being infected with the COVID-19 virus. Mother also breached Grandmother's rules on

Christmas Day 2020 when she showed up at the apartment building unannounced, decorated the hallway wall like a Christmas tree, and put presents for Child and her family members under it. Grandmother was frustrated because Mother did not communicate with her first and it "felt like a photo op." Mother's refusal to recognize any boundaries caused friction between them.

Grandmother asked the court to continue the status quo by allowing her to retain sole legal and physical custody of Child. She suggested that visitation with Mother remain supervised, and that Child's therapist determine how often Child should see Mother, consistent with his best interests.

On cross-examination, Grandmother acknowledged that when Child came into her care, she told a caseworker from the Anne Arundel County Department of Social Services that Mother's "first and foremost priority was [Child]." Many years later, during this litigation, Grandmother wrote a letter to the court custody evaluator in which she stated that she was fighting for "more than just [her] grandchild, [she was] fighting for [her] family's respect." She added that she felt that she "got it right" when she raised L.F. and "left someone from my bloodline who c[ould] represent the family like [her late] mom would have wanted."

In her answers to interrogatories, Grandmother was asked to identify Mother's strongest attribute as a parent. She responded: "None."

In response to questioning from the court, Grandmother testified that she receives for Child's care two military benefits and one benefit from the Social Security Administration. The benefits total approximately $3,800 per month. Grandmother also

20

was the fiduciary of two trusts holding life insurance benefits that Child received upon Father's death and Mother's murder conviction.

The court asked Grandmother if she had reached out to Mother to tell her that Child contracted COVID in December 2021. She did not recall telling Mother because she was busy taking care of Child, who was quite ill. She added that it was a struggle communicating with Mother.

The court asked Grandmother to define a "healthy relationship with [her] daughter." Grandmother replied that it would start with Mother respecting boundaries, following rules and guidelines and not missing supervised visits with Child for "flippant reasons." The court asked Grandmother why Child called her "Mommy." She explained that he started calling her that when he was very young and his "whole life was flipped upside down," and she thought he deserved that normalcy.

The court also questioned why Grandmother did not include Mother in holiday gatherings before the *pendente lite* order was entered. Grandmother responded that she did include her at first, but she started noticing "familiar behavior" that had "hurt a lot of people." Mother had not made good decisions throughout her life and decided to abandon her son by murdering his father and then planning to flee the country without him.

Mother testified in rebuttal, denying that she planned to kill Father or that she ever asked anyone to help kill him. When asked why she consented to Grandmother having sole legal and physical custody of Child, she replied that she was worried that Father's family, who did not live locally, would try to obtain custody of him. It "was never [her] intention to be a permanent arrangement."

21

At the end of the second day of trial, Mother requested that the court enter an interim access order until trial resumed. After hearing argument, the court ordered that Mother would receive supervised access with Child at her house Saturday and Sunday from 10 a.m. until 4 p.m. for the two weekends before the next hearing date, then scheduled for February 16, 2022. In addition, Mother was permitted to FaceTime with Child each Monday and Friday before 7:00 p.m. The parties would split the cost of the supervisor fees.

## C.

### Merits Hearing: Day Three

Trial resumed on February 24, 2022.[9] Ms. Jackson, the court's custody evaluator, testified that she had completed a visitation evaluation in March and April 2021. Her report was admitted into evidence. Grandmother provided Ms. Jackson with a long list of concerns regarding Mother, including that Mother had "never made a decision that serves [Child's] best interest," she is a "habitual liar and manipulator," and Mother lied about the circumstances of Father's death and was violent and aggressive towards Father. Mother expressed concerns about Grandmother limiting her access to Child, suggesting that Grandmother was doing so to preserve her lifestyle with financial benefits that Child was entitled to from Father's life insurance policy and the military.

---

[9] When the parties appeared for trial on February 16, 2022, Mother sought to discharge her counsel and filed a *pro se* motion to recuse the trial judge. She ultimately determined not to discharge counsel, and he argued her motion to recuse, which was denied. Mother noted an immediate appeal from the denial of her motion to recuse and from the interim access order, which this Court dismissed. *See S.C. v. M.S.S.*, No. 2079, Sept. Term, 2021 (filed Aug. 18, 2022).

22

Ms. Jackson remotely observed each party with Child and neither observation raised concern. She also interviewed Child at the courthouse. He told Ms. Jackson that he calls Grandmother "Mommy" and Mother "Mom." He described spending most of his free time at Grandmother's house playing video games or on his iPad. He said he liked spending time with Mother because she was fun, but he did not know much about her because he did not get to see her often. He looked forward to visits with her. He did not want to talk to Ms. Jackson about why he did not live with Mother. He only would say that Mother went "to a place," and he did not know why she went there because "she didn't do a bad thing." He recalled hearing Mother and Grandmother argue over the phone one day after Grandmother took the phone away from him while he was speaking to Mother. He was confused about why they were upset. When asked what he would wish for if he had three wishes, Child replied that he wanted to go to Disney World, own "every single RC car or truck," and "see my mom."

Ms. Jackson interviewed numerous persons provided by both parties, including Mother's therapist, her probation agent, her former social worker, Child's pediatrician, Mr. Allen, Ms. Glover, L.F., Ms. Ben Arar, and Ms. Boyd. Mother's therapist described Mother as resilient, and she had no reservations about Mother's ability to parent. Mother's probation agent said that Mother was compliant with the conditions of her probation. Leslie Foster, Mother's former social worker who had assisted with access to Child, described Grandmother as challenging and overbearing. She observed "genuine love" between Child and Mother during the one visit she supervised.

23

Mr. Allen told Ms. Jackson that Mother was a con artist who uses people. He said that Child was happy with Grandmother, and she should be responsible for making decisions about Child's life.

Ms. Jackson also reviewed police reports, an investigatory report completed by the Anne Arundel County Department of Social Services upon Mother's arrest, Child's school reports, a psychosocial assessment of Mother completed after her release from prison, and a psychiatric assessment of Mother. Ms. Jackson noted that, although Child's pediatrician reported that Child had met with a pediatric psychologist on six occasions between 2017 and 2020, Grandmother had not reported that he was in therapy. "Due to the misinformation" about Child's mental health history, the Child Privilege Attorney assigned to Child was unable to speak to the pediatric psychologist prior to completion of the report.

Ms. Jackson concluded that both parties were fit to care for Child. She credited Mother's reports, the reports of her collateral witnesses, and other evidence showing that Father committed intimate partner violence against Mother, including physical violence and sexual violence. The evaluator had no concerns about Mother's mental health given her psychiatric evaluation and her continuation of therapy to address her PTSD diagnosis.

Ms. Jackson presented the parties' competing viewpoints about the circumstances surrounding Father's death. She found that the relationship between Mother and Father was "complicated and frankly, dangerous." The military documented violence in their relationship and "labeled them to be high risk." Ms. Jackson noted that the State of Maryland had determined that Mother served adequate time for her involvement in Father's death, and there was no reason to believe she was a danger to the community or to Child.

24

Ms. Jackson found that Child was comfortable with both parties, and he had a "strong desire" to spend more time with Mother. She recommended that Child work with a mental health professional to assist him as he asked more questions about the circumstances of Mother's conviction and Father's death.

With respect to the sincerity of the parties' requests relative to custody and visitation, Grandmother said that she was fighting for Child and her "family's respect." Ms. Jackson stated that Grandmother was "embarrassed and horrified about [Mother's] crime and incarceration." Though Grandmother sincerely believed that it was in Child's best interest for him to remain in her care and to only have supervised contact with Mother, Grandmother did not appreciate "how her gatekeeping behavior might impact [Child]," noting that Child was not a "do over" for Grandmother's failures in parenting Mother. Child wanted and deserved to know Mother. Ms. Jackson believed that, if the court maintained the status quo, Grandmother would continue to restrict Mother's access to Child.

Ms. Jackson found that Mother had "demonstrated the utmost sincerity in her requests for custody and access" and shown that she was putting Child's best interests first despite her desire to parent him full time. She had been consistent in her desire to spend time with Child since her release and had made every effort to see him. She understood that Child's relationship with Grandmother was significant, and they were well-bonded. She wanted to support that relationship, and she had requested a gradual transition to her custody.

25

Ms. Jackson noted that Child expressed a desire to spend more time with Mother. She concluded that it would be in Child's best interest to have "frequent and consistent contact with [Mother]" and recommended a schedule of visitation going forward. With respect to Mother's request for custody of Child, Ms. Jackson found that she was "capable of parenting [Child] independently," but she needed to demonstrate those capabilities to Grandmother and the court. She recommended that Mother continue in therapy.

Ms. Jackson found that Grandmother had stepped up to care for Child during a difficult time and put his needs before her own. She likewise recommended that Grandmother pursue therapy to process her trauma and learn "tools and strategies that [would] be necessary in her co-parenting relationship with" Mother.

Ms. Jackson testified at trial consistent with her report. She considered it "noteworthy" that Grandmother withheld from her the information that Child had seen a therapist, and she was concerned that Grandmother restricted Mother's access to Child. With respect to Child calling Grandmother "Mommy," Ms. Jackson noted that Grandmother had filled that role in his life for a long time, but Child understood "everyone's role in his life," and he knew that Mother was his mother.

Grandmother testified a second time on the final day of trial that she was fearful of Mother. Grandmother worried that she might "end up like [Father]." She had spoken to Ms. Jackson about her fears during the visitation evaluation, but they were not included in the report.

In closing argument, Mother's attorney argued that the court should award her sole legal and physical custody of Child, either immediately or subject to the graduated

26

transition plan set forth in her amended complaint to modify custody. She maintained that two material changes had occurred since the entry of the prior custody order: (1) Mother's release from prison; and (2) Grandmother's decision to limit Mother's access to Child.

Counsel argued that, because Mother was a fit parent according to Ms. Jackson and everyone who had supervised visits between her and Child, she had a fundamental right to parent Child absent evidence that Grandmother was Child's *de facto* parent or proof of exceptional circumstances making an award of custody to Mother detrimental to Child's best interests. Counsel asserted that Grandmother was not a *de facto* parent because she did not assume the obligations of parenthood without expectation of financial compensation, noting Mr. Stovall's testimony that Grandmother was focused upon the benefits she was entitled to receive by caring for Child and the lack of any evidence showing how Grandmother spent nearly $3,800 per month on his care.

Turning to exceptional circumstances, counsel for Mother argued that there was no evidence that returning Child to Mother's care would be detrimental to his best interests. To the contrary, the evidence showed that Mother was loving and attentive to Child's needs, and he was eager to spend more time with her and get to know her again.

Counsel next argued that FL § 9-101.2, which generally provides that a court may not award custody to a parent found guilty of murder of the other parent, did not bar an award of custody to Mother because the legislature included a good cause exception, which Mother satisfied. Mother showed good cause by presenting evidence that she killed Father in self-defense after years of documented domestic violence, that Child had remained in contact with her since her conviction and continued to express an interest in seeing her,

27

and that Mother was not a risk to Child according to all the professionals who had been involved in the case. Good cause also was evidenced by application of the best interest factors, which counsel argued supported Mother's request for custody.

Grandmother's counsel argued that she should retain sole legal and physical custody of Child. He argued that the law favored stability in custody when a child is thriving, as the evidence showed in this case. Further, Grandmother's counsel maintained that Mother had not satisfied the high burden under FL § 9-101.2 to show by clear and convincing evidence that there was good cause to award her custody of Child despite her conviction for second-degree murder of Father. He pointed to the testimony from Mr. Allen, Mr. Glover, and Grandmother that showed, contrary to Mother's assertion of self-defense, that Mother planned to murder Father and sought outside assistance.

Counsel argued that the evidence that Mother planned Father's murder and, in the aftermath of the murder, planned to flee the country, also supported a finding that she had abandoned Child. He asserted that this abandonment, coupled with the overwhelming evidence that Grandmother had occupied a parental role in Child's life for many years, amounted to exceptional circumstances.

The court held the matter *sub curia*. It entered a new interim access order granting Mother alternating, supervised weekend access on Saturdays and Sundays from 10 a.m. until 8 p.m. and Wednesday night dinner access in the week before a non-access weekend.

## V.

## Circuit Court's Custody Order

On April 8, 2022, the circuit court issued a 36-page memorandum opinion granting Mother sole legal and physical custody of Child. As discussed in more detail, *infra*, the court found: (1) that Mother's release from incarceration and other facts demonstrated a material change in circumstances; (2) that Mother had proven by clear and convincing evidence that good cause existed under FL § 9-101.2 to award her custody; (3) that it was in Child's best interest to return to the custody of Mother, his natural parent; and (4) that Grandmother had not shown that Mother was unfit, that exceptional circumstances existed, or that Grandmother was a *de facto* parent.

The court issued an accompanying order awarding Mother sole legal and physical custody of Child. The transition of physical custody from Grandmother to Mother was graduated, with Mother initially receiving unsupervised weekend access for three weeks, then unsupervised alternating week-on, week-off access for two months, and then full custody beginning July 1, 2022. The court further ordered that Mother and Child would participate in reunification therapy, the cost of which would be split between the parties, and that Child would continue in individual therapy.

This timely appeal followed.[10]

---

[10] Grandmother moved to stay the court's order pending resolution of this appeal. The circuit court denied the motion.

STANDARD OF REVIEW

In an action tried to the court, we "review the case on both the law and the evidence" and "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, [giving] due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8-131(c). "'When a trial court decides legal questions or makes legal conclusions based on its factual findings, we review these determinations without deference to the trial court.'" *E.N. v. T.R.,* 474 Md. 346, 370 (2021) (cleaned up).

## DISCUSSION

### I.

### Grant of Custody to Mother

Grandmother contends that the circuit court erred in granting sole legal and physical custody to Mother for several reasons. Initially, she argues that the court erred in allowing Mother to present evidence regarding events that predated the prior custody order, which she alleges was inappropriate in a custody modification proceeding. Moreover, she asserts that the court erred in its custody analysis by: (1) characterizing Grandmother as a third person seeking custody, disregarding that she already had custody; (2) finding that she was not a *de facto* parent; and (3) finding that exceptional circumstances did not exist to warrant Grandmother retaining custody. Finally, Grandmother argues that the court erred by awarding custody to Mother, who murdered Father, based on a finding of good cause pursuant to FL § 9-101.2.

Mother contends that the circuit court properly awarded her custody. She asserts that her request for modification of custody involved circumstances not in existence at the

30

time of the custody order, and evidence of Father's previous domestic violence towards her was properly admitted to show good cause to grant custody to her under FL § 9-101.2. Mother argues that the circuit court did not abuse its discretion in its custody analysis and properly found that Grandmother was a third party, not a *de facto* parent, and that Grandmother failed to show exceptional circumstances. In any event, she asserts that, even if the circuit court did err in this regard, any error was harmless because the court engaged in a best interest analysis and determined that it was in Child's best interest for Mother to have full custody. Finally, Mother argues that the court did not err in finding that good cause existed to support awarding custody to her.

## A.

### Custody Determinations Generally

"The fundamental liberty interests of parents provide the constitutional context that looms over any judicial rumination on the question of custody or visitation." *Barrett v. Ayres*, 186 Md. App. 1, 17 (cleaned up), *cert. denied*, 410 Md. 560 (2009). "The rights of parents to direct and govern the care, custody, and control of their children is a fundamental right protected by the Fourteenth Amendment of the United States Constitution." *Conover v. Conover*, 450 Md. 51, 60 (2016) (cleaned up). *Accord Troxel v. Granville*, 530 U.S. 57, 66 (2000) (Substantive due process protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children."). At the same time, "[t]he primary goal of access determinations in Maryland is to serve the best interests of the child." *Conover*, 450 Md. at 60. *Accord Taylor v. Taylor*, 306 Md. 290, 303 (1986) ("[I]n any child custody case, the paramount concern is the best interest of the child.").

31

In custody disputes between parents, neither parent has a superior claim to the right to custody, and the issue is decided based on the best interests of the child. *McDermott v. Dougherty*, 385 Md. 320, 353 (2005). A different analysis applies, however, when a third party seeks custody. *Conover*, 450 Md. at 60 ("[T]he rights of parents to custody of their children are generally superior to those of anyone else."). As the Court of Appeals has explained:

> Where the dispute is between a fit parent and a private third party, however, both parties do not begin on equal footing in respect to rights to "care, custody, and control" of the children. The parent is asserting a fundamental constitutional right. The third party is not.

*Id.* (quoting *McDermott*, 385 Md. at 353). "'Where parents claim the custody of a child, there is a *prima facie* presumption that the child's welfare will be best subserved in the care and custody of its parents rather than in the custody of others, and the burden is then cast upon the parties opposing them to show the contrary.'" *McDermott*, 385 Md. at 424 (quoting *Ross v. Pick*, 199 Md. 341, 351 (1952)). *Accord B.O. v. S.O.*, 252 Md. App. 486, 504 (2021) (A third party, such as a grandparent, "'has no fundamental constitutional right to raise the children of others.'") (quoting *McDermott*, 385 Md. at 353).

Prior to 2016, when the Court of Appeals recognized *de facto* parenthood in *Conover*, Maryland courts required third parties seeking custody to overcome the presumption that the child's best interests is to be in the parent's custody by proving either that the child's natural parents were unfit to have custody or that there were exceptional circumstances making parental custody detrimental to the best interest of the child. *Conover*, 450 Md. at 61; *Kpetigo v. Kpetigo*, 238 Md. App. 561, 569 (2018) (quoting *Ross*

32

*v. Hoffman*, 280 Md. 172, 178–79 (1977)).  "[I]n custody cases, 'unfitness means an unfitness to have custody of the child, not an unfitness to remain the child's parents; exceptional circumstances are those that would make parental custody detrimental to the best interest of the child.'"  *E.N. v. T.R.*, 474 Md. at 372 (quoting *In re Adoption/Guardianship of H.W.*, 460 Md. 201, 217 (2018)).  Only if the third party showed unfitness or exceptional circumstances would a trial court "consider whether that third party should be awarded custody under the best interests of the child standard."  *Basciano v. Foster*, ___ Md. App. ___, No. 1978, Sept. Term, 2021, slip op. at 20 (filed Nov. 1, 2022).  *Accord Conover*, 450 Md. at 61.

In *Conover*, the Court of Appeals adopted another avenue for a third party to obtain custody.  The Court held that a third party could request custody if the third party established qualification as a *de facto* parent, i.e., "'a party who claims custody or visitation rights based upon the party's relationship, in fact, with a non-biological, non-adopted child.'"  *Conover*, 450 Md. at 62 (quoting *Janice M. v. Margaret K.*, 404 Md. 661, 680–81 (2008)).  To qualify as a *de facto* parent, a party must satisfy a four-part test showing that the party occupied a parental role in the child's life with the consent and encouragement of the child's parent(s).  This test, which was "narrowly tailored to avoid infringing upon the parental autonomy of a legal parent," is as follows:

> (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child;
>
> (2) that the petitioner and the child lived together in the same household;

33

(3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and

(4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*Id.* at 74 (quoting *In re Custody of H.S.H.-K.*, 533 N.W.2d 419, 421, 435–36 (Wis. 1995)).

"[T]hese factors set forth a high bar for establishing *de facto* parent status, which cannot be achieved without knowing participation by the biological parent." *Id.* The *de facto* parenthood doctrine is not inconsistent with a parent's right to direct the care and custody of the parent's child because "a legal parent does not have a right to voluntarily cultivate their child's parental-type relationship with a third party and then seek to extinguish it." *Id.* at 75. When a legal parent permits a person to develop a parent-like relationship with a child, "the legal parent's rights to unilaterally sever that relationship are necessarily reduced." *Id.* (quoting *Marquez v. Caudill*, 656 S.E.2d 737, 744 (S.C. 2008)). *Accord Kpetigo*, 238 Md. App. at 573 (If a parent has made "a conscious parenting decision to foster a parent-caliber relationship between a third party and [the] child," then the "parent's consent to a prior and intentional parental relationship counterbalances (or supersedes) [their] otherwise preemptive right to determine whether and to what extent another adult is involved in [the] child's life.").

If a third party establishes a relationship of *de facto* parenthood, that person is deemed to have status equal to a biological or adoptive parent in custody determinations. *Basciano*, slip op. at 33; *David A. v. Karen S.*, 242 Md. App. 1, 27–28, *cert. denied*, 466

34

Md. 219 (2019). A court then analyzes the best interests of the child to determine custody. *Conover*, 450 Md. at 85.

With this general background, we turn to the analysis in this case.

**B.**

**Analysis**

The custody analysis in this case requires multiple steps. First, we must determine the effect of the 2014 custody order to Grandmother. We then assess whether Mother made a sufficient showing that this custody order should be revised. If Mother met that showing, she then had to show that, despite being found guilty of murdering Father, good cause existed under FL § 9-101.2 to permit the court to award custody of Child to her. If she met that showing, there would be a presumption that it was in Child's best interest to be in Mother's custody, unless Grandmother showed that Mother was unfit, there were exceptional circumstances, or Grandmother qualified as a *de facto* parent. We will address each of these steps in the analysis, in turn.

**1.**

**Prior Order Granting Grandmother Custody**

This case is unlike other third-party or grandparent custody cases because, here, Grandmother was awarded sole legal and physical custody of Child in 2014 by court order, pursuant to Mother's written consent, and she has had sole custody of Child for approximately eight years. Grandmother argues that this custody order put her "on equal footing" with Mother in the custody dispute. We disagree.

The court's order did not, by itself, terminate Mother's parental rights or give

Grandmother status as a legal parent. As this Court explained in *Green v. Green*, 188 Md.

App. 661, 681 (2009):

> We do not regard an order granting custody of a child to a third party, subject
> to modification and with appropriate visitation privileges reserved to the
> parent, as the equivalent of terminating parental rights. . . . It does not deny
> the parent the right to visit, communicate with, or ever regain custody.

(quoting *Shurupoff v. Vockroth*, 372 Md. 639, 656–57 (2003)).

Parents should not be discouraged from seeking help when they are having trouble

meeting their parental responsibilities. Indeed, "[f]or the sake of children, society should

encourage parents who are experiencing difficulties raising them to take advantage of an

available 'safety net,' such as a grandparent who is willing to accept temporary custody of

a child." *In re Guardianship of L.L.*, 745 N.E.2d 222, 233 (Ind. Ct. App.), *trans. denied*,

753 N.E.2d 17 (Ind. 2001). As the Supreme Court of South Carolina noted in *Moore v.*

*Moore*, 386 S.E.2d 456, 459 (S.C. 1989):

> If a party relinquishes custody in good faith because of some temporary
> inability to provide for the child, such parent should be able to regain custody
> upon a showing that the condition which required relinquishment has been
> resolved. Child custody should not be subject to change because of adverse
> possession.

Nevertheless, "custody and visitation orders entered by the court are intended to

carry some amount of finality." *Barrett*, 186 Md. App. at 18 (citing *McCready v.*

*McCready*, 323 Md. 476, 481–82 (1991)). Thus, when Mother was released from prison,

to regain custody of Child, she was required to petition the court for custody of Child and

show a material change of circumstances. *See Burak v. Burak*, 455 Md. 564, 649–50 (2017)

36

(After a trial court grants custody to a third party, "a parent is not foreclosed from seeking to regain custody of his or her child in the future upon a showing of changed circumstances."); *In re Rashawn H.*, 402 Md. 477, 496 (2007) (Custody orders are subject to judicial reconsideration "upon a showing of changed circumstances.").

**2.**

**Material Change in Circumstances**

When presented with a request to change custody or visitation, the trial court must engage in a two-step process:

> First, the circuit court must assess whether there has been a "material" change in circumstance. *See Wagner v. Wagner*, 109 Md. App. 1, 28 (1996). If a finding is made that there has been such a material change, the court then proceeds to consider the best interests of the child as if the proceeding were one for original custody. *See id.; Braun v. Headley*, 131 Md. App. 588, 610 (2000).

*McMahon v. Piazze*, 162 Md. App. 588, 594 (2005). A change is material if it affects the welfare of the child. *Id. Accord Wagner*, 109 Md. App. at 28 ("In [the custody modification] context, the term 'material' relates to a change that may affect the welfare of a child."). Evidence bearing upon materiality necessarily relates to the best interests of the children. *Gillespie v. Gillespie*, 206 Md. App. 146, 171 (2012).

Here, the trial court found that Mother met her burden of showing a material change of circumstances in several ways. First, her release from incarceration was a change because, at that point, she could care for Child. Second, her efforts to establish a stable environment for Child, including her acquiring a home and seeking stable, full-time employment, was a change in circumstances from her residence in prison when the initial

37

custody order was granted. Third, her desire as a fit parent to modify the custody and visitation arrangement with Grandmother was a material change in circumstances.

Grandmother does not directly challenge these findings. Instead, she argues that, in the posture of a custody modification proceeding, the court could consider only evidence that has occurred since the last custody order.

As Grandmother notes, reconsideration of custody orders generally should focus on "changes in circumstances which have occurred subsequent to the last court hearing." *Hardisty v. Salerno*, 255 Md. 436, 439 (1969). Evidence of past history, however, may be relevant to a party's present fitness for custody. *Raible v. Raible*, 242 Md. 586, 594–95 (1966).

Here, the changes in circumstance found by the circuit court *did* post-date the last custody determination. When custody was awarded to Grandmother in 2014, Mother was incarcerated awaiting trial for Father's murder. Her release from prison, coupled with her efforts to create a stable environment in which she could parent Child, and her decision that Child's best interests were now served by being in her custody, plainly satisfied her threshold burden of demonstrating a material change of circumstances affecting Child's welfare. *See Barrett*, 186 Md. App. at 19 (holding, in the context of a motion to modify visitation between a child and their grandparents filed by the child's mother, that "the desire of a fit parent to modify visitation with a third party, [absent] exceptional circumstances, presents a material change in circumstances"). The court did not err in finding a material change in circumstances.

With respect to Grandmother's argument that the circuit court erred in permitting evidence regarding facts preceding the initial award of custody to Grandmother, the evidence regarding Mother's relationship with Father and the circumstances of Father's death was admissible to evaluate whether it was in Child's best interest for Mother to have custody, and as will be discussed, *infra*, whether Mother satisfied the good cause exception under FL § 9-101.2(a). The circuit court did not err or abuse its discretion in admitting this evidence or in finding a material change in circumstances.

### 3.

### FL § 9-101.2

After finding a material change in circumstances, the court addressed FL § 9-101.2, which provides, in relevant part, as follows:

> (a) Except as provided in subsection (b) of this section, unless good cause for the award of custody or visitation is shown by clear and convincing evidence, a court may not award custody of a child or visitation with a child:
>
> (1) to a parent who has been found by a court of this State to be guilty of first degree or second degree murder of the other parent of the child . . .;
>
> \*       \*       \*
>
> (b) If it is in the best interest of the child, the court may approve a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child.

FL § 9-101.2(a)–(b). Here, as indicated, Mother pleaded guilty, by means of an *Alford* plea, to a charge of second-degree murder, and therefore, the court could award custody of Child to Mother only if it was satisfied by clear and convincing evidence that there was good cause to do so. The circuit court found that Mother had "demonstrated by clear and

39

convincing evidence that good cause exists for the Court to set aside the statutory prohibition on granting her custody and/or access."

Grandmother contends that the circuit court erred in finding good cause, asserting that the court erred by not addressing the "guideposts" set forth in FL § 9-101.2(b) pertaining to an award of supervised visitation. She argues that the court failed to assure the physical safety or "physiological, psychological, and emotional well-being" of Child.

Mother contends that the court did not commit clear error in its application of FL § 9-101.2. Instead, she argues that the court properly applied the statute and found good cause. We agree.

As the parties and the circuit court recognized, the "good cause" requirement in FL § 9-101.2 is not defined in the statute, and the Maryland appellate courts have not previously addressed the issue. The General Assembly enacted FL § 9-101.2 in 2006. *See* 2006 Md. Laws ch. 112. The statute is based on "Lizzie's Law," a Massachusetts statute enacted in 1997 in response to public outcry after an incarcerated father, who was convicted of the first degree murder of his daughter's mother in her presence, sought to compel the maternal grandparents to bring the child to visit him. *See* Dep't of Legislative Services, *Fiscal and Policy Note*, S.B. 76 (2006), at 2; *See also* Jennifer E. Sims, *"Lizzie's Law": Must We Choose Between the Rights of the Parent and Protecting the Child?*, 25 New Eng. J. on Crim. & Civ. Confinement 245, 245–46 (1999) (describing the legislative history of Lizzie's Law).[11] As the circuit court noted, however, the Massachusetts law, which permits

---

[11] Lizzie's Law, Mass. Gen. Laws ch. 209, § 37, provides, as follows:

40

visitation with consent, does not aid in the construction of the "good cause" exception under the Maryland statute.

In other circumstances where the phrase "good cause" is not defined in a statute, the Court of Appeals has concluded that the "[p]hrase good cause depends upon [the] circumstances of [the] individual case," and a finding of its existence is vested in the discretion of the "court to which [the] decision is committed." *State v. Toney*, 315 Md. 122, 132 (1989) (quoting *Black's Law Dictionary* 623 (5th ed. 1979)). It is "a relative and highly abstract term," and the meaning of "good cause" is determined by the text of the statute, the "context of [the] action," and the "procedures involved in [the] type of case presented." *In re Robert G.*, 296 Md. 175, 179 (1983) (quoting *Black's Law Dictionary* 623 (5th ed. 1979)).

When "good cause" is used as an undefined term in a statute, it is a "flexible term" that is "not amenable to general rules or rigid formulas. Instead, its meaning must be deduced from the facts of each case in a manner that is consistent with the [statute's] fundamental purpose." *Meek v. Linton*, 245 Md. App. 689, 721 (2020) (quoting *Trexler v. Unemployment Compensation Board of Review*, 365 A.2d 1341, 1344 (Pa. Commw. Ct.

No court shall make an order providing visitation rights to a parent who has been convicted of murder in the first degree of the other parent of the child who is the subject of the order, unless such child is of suitable age to signify his assent and assents to such order; provided, further, that until such order is issued, no person shall visit, with the child present, a parent who has been convicted of murder in the first degree of the other parent of the child without the consent of the child's custodian or legal guardian.

41

1976)) (cleaned up). In *Meek*, 245 Md. App. at 723, this Court held that the phrase "good cause" under Md. Code Ann., Est. & Trusts Art. § 13-707(c)(1) (2017 Repl. Vol.), which provides that a court can appoint a person with lower priority as a guardian based on a finding of good cause, meant a substantial reason to find that the person with lower priority was a better choice to act in the best interest of the ward.

Similarly, in a child custody case, where the primary concern in child custody cases is the best interests of the child, we hold that good cause to grant custody to a parent who has been found guilty of murdering the child's other parent means a substantial reason to find that it is in the child's best interests to return to the parent's custody. That definition is flexible, and in making its determination, the court should consider the facts and circumstances of each case. We review the court's decision in this regard for an abuse of discretion.

Here, the circuit court made clear that, pursuant to Maryland law, the best interests of Child were paramount to its decision. The court stated that, in the context of FL § 9-101.2, the court could protect the welfare and best interests of Child by ensuring that he was safe from future acts of domestic violence. In this regard, Mother had no prior convictions, there was no evidence that Mother had committed any acts of violence or aggression since the murder, and Mother had taken concrete steps to "rebuild her life," including obtaining stable housing and employment, engaging consistently in therapy, and complying with the terms of her probation.

The court found that Mother's "motivation for committing the crime clearly stemmed from years of physical and sexual abuse at the hands of [Father]." It credited

42

Mother's testimony that, on the night of the murder, Father violently attacked her and attempted to rape her. The court found that the killing was provoked by his attack and lengthy history of domestic violence.[12]

The court noted that Mother genuinely wanted to be with her son, that she had maintained a loving relationship with Child, and Child wanted to have a relationship with Mother. This was not a case, unlike the case that precipitated Lizzie's Law, where the court was compelling Child to have a relationship with Mother.

Based on all the evidence, the circuit court found that Mother did not pose a future danger to Child, and she had shown good cause to permit the court to consider an award of custody to her. We perceive no abuse of discretion in this regard.[13]

**4.**

**Third-Party Custody Disputes**

Once the circuit court found that Mother established a material change in circumstances and showed good cause to permit a grant of custody pursuant to FL § 9-101.2, the court then addressed the bests interests of the child. Because this was a custody dispute between Mother (i.e., a legal parent) and Grandmother (i.e., a third party), there

---

[12] The court rejected Grandmother's testimony and the testimony of Mr. Glover that Mother had planned Father's murder and solicited assistance. The court found that their testimony on that subject lacked veracity and declined to consider it, noting that neither Mr. Glover nor Grandmother ever reported the alleged conversations to the police or prosecution before or after Father's murder and supported Mother during her criminal case.

[13] After finding that Mother had shown good cause pursuant to FL § 9-101.2, the court stated that its finding of good cause was a "threshold step towards obtaining custody," and that after finding good cause, it would determine whether it was in the best interests of Child to award custody to Mother.

was a constitutional presumption that Mother's decision regarding custody was in Child's best interest. *See Barrett*, 186 Md. App. at 19 (The court generally presumes that a parent's decision regarding visitation and custody by a third party is in the child's best interest.). To rebut that presumption, Grandmother had to show Mother's parental unfitness, exceptional circumstances, or Grandmother's status as a *de facto* parent. *See E.N.*, 474 Md. at 393. Only if Grandmother made that showing and rebutted the constitutional presumption in favor of Mother would the court be required to determine whether awarding custody to Grandmother would be in Child's best interest. *Id.*

Grandmother does not challenge the court's finding that Mother was a fit parent. She argues, however, that the circuit court erred in finding that: (1) she was not a *de facto* parent; and (2) she failed to prove extraordinary circumstances. As explained below, we agree that the circuit court erred in finding that Grandmother failed to meet her burden to show that she was a *de facto* parent.[14]

"The term '*de facto* parent' means 'parent in fact' and is used to describe a party, other than a child's legal parent, *i.e.*, biological or adoptive parent, who claims custody or visitation rights based upon the party's relationship with a non-biological, non-adopted child." *E.N.*, 474 Md. at 351. As indicated, a person claiming *de facto* parent status must prove the following:

> (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child;

> (2) that the petitioner and the child lived together in the same household;

---

[14] Based on this conclusion, it is not necessary to address exceptional circumstances.

(3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and

(4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*Conover*, 450 Md. at 74 (quoting *H.S.H.-K.*, 533 N.W.2d at 421, 435–36).[15]

Here, the circuit court found that Grandmother failed to satisfy the first prong of the test, noting that this prong was "critical to the *de facto* parent doctrine because it ensures a biological parent continues to direct the care and custody of their child pursuant to their fundamental right under the U.S. Constitution, while also preventing mere caretakers from becoming *de facto* parents." The court found that Grandmother failed to prove that Mother consented to the formation of a parent-like relationship because, although Mother consented to Grandmother having legal and physical custody of Child while Mother was incarcerated, Mother testified that this consent was for Grandmother to have temporary custody during Mother's incarceration, not consent for a permanent, parent-like relationship. The court found that Mother's attempt to regain custody of Child immediately

---

[15] Mother contends that Grandmother failed to raise any contention in the circuit court that she was Child's *de facto* parent, and she did not argue below that she had satisfied the four-part *Conover* test. Mother is correct that Grandmother did not directly raise this issue in her pleadings or argue it in the circuit court. Nevertheless, Mother raised the issue, and Grandmother's counsel argued that Grandmother was a "parental figure" in Child's life and that Mother consented "knowingly and voluntarily to [Grandmother] having sole legal and sole physical custody of [Child]." Although we ordinarily will not decide an issue unless it was raised in and decided by the circuit court, *see* Md. Rule 8-131(a), the trial court decided the issue of *de facto* parent status, and therefore, we will consider it on appeal.

45

following her release from prison showed that Mother intended Grandmother's custody to be temporary. Thus, the court concluded that Grandmother was not a *de facto* parent.

We agree with the circuit court that the first prong of the *Conover* test is critical to the *de facto* parent analysis. *See Conover*, 450 Md. at 75 (The first prong is "critical because it makes the biological or adoptive parent a participant in the creation of the psychological parent's relationship with the child.") (quoting *Marquez*, 656 S.E.2d at 744). We disagree, however, with the circuit court's conclusion that Grandmother did not satisfy this prong of the *Conover* test.

Although a parent has a right to direct the care and custody of their children, this first prong of the analysis "recognizes that when a legal parent invites a third party into a child's life, and that invitation alters a child's life by essentially providing him with another parent, the legal parent's rights to unilaterally sever that relationship are necessarily reduced." *Middleton v. Johnson*, 633 S.E.2d 162, 169 (S.C. Ct. App. 2006). A legal parent has control over whether to invite someone into the private sphere between parent and child, but "[w]here a legal parent encourages a parent-like relationship between a child and a third party, 'the right of the legal parent [does] not extend to erasing a relationship between [the third party] and her child which [the legal parent] voluntarily created and actively fostered.'" *Id.* (quoting *V.C. v. M.J.B.*, 748 A.2d 539, 552 (N.J. 2000)).

The court found that the first prong of *Conover* was not shown because Mother's consent was for temporary custody; she did not intend to consent to a *de facto* parent relationship between Child and Grandmother. In addressing the court's decision in this regard, the analysis set forth in *E.N.* is instructive.

In that case, the issue was whether, when there are two legal parents, "a *de facto* parent relationship may be created through the fostering and consent of only one legal parent to the formation of such a relationship, without the consent of the second legal parent." *E.N.*, 474 Md. at 355. The Court answered the question in the negative and held that, when there are two legal parents, "both legal parents must consent to and foster a third party's formation and establishment of a parent-like relationship with a child under the first factor of the [*Conover*] test." *Id.* at 354. The Court ultimately held that T.R., the girlfriend of D.D., the biological father of two children, was not a *de facto* parent because there was no evidence that the children's biological mother consented to or fostered the formation of a parent-like relationship between the children and T.R. *Id.* at 355.

Relevant to the present case is the Court's analysis of D.D.'s consent to a parent-like relationship. In 2013, after E.N. and D.D. separated, D.D. and T.R. began a relationship and moved in together. *Id.* at 356. In 2015, when the two children were eight and ten, they moved in with D.D. and T.R. *Id.* at 356–57. In 2017, D.D. was arrested, and he subsequently was convicted of drug and firearm offenses, with a release date in August 2024. *Id.* at 357. The children continued to live with T.R. for several months until E.N. asked for her children to be returned to her. *Id.* T.R. refused, and in 2018, she filed a complaint against E.N., seeking sole custody of the children. *Id.* at 357–58. T.R. included a letter from D.D., stating that he granted T.R. full custody of the children "for legal guardianship while [he was] incarcerated." *Id.* at 358.

In assessing whether D.D. consented to and fostered the formation of a parent-like relationship between T.R. and the children, the Court concluded that he did. *Id.* at 404–05.

47

Although D.D. did not expressly seek *de facto* parent status for T.R., seeking only for T.R. to have custody while he was incarcerated, the Court concluded that his "conduct met the requirement that he consent to and foster her formation and establishment of a parent-like relationship with the children." *Id.* at 404. Thus, the Court held that, if D.D. was the only legal parent of the children, the first factor of the *Conover* test would be satisfied. *Id.* at 405. It explained that, even if a legal parent opposes the grant of *de facto* parenthood status for a third party, a court may find *de facto* parenthood status if all of the factors of the test are satisfied. *Id.*

Here, the evidence showed that Mother took Child to Grandmother before turning herself in to the police. She signed a form consenting to Grandmother having sole legal and physical custody while Mother was facing first-degree murder charges and an indefinite, and likely lengthy, sentence. Mother subsequently entered into an *Alford* plea resulting in a sentence of ten years' imprisonment, and she did not seek to modify custody until years later, after she was released from prison.[16] During an eight-year period, from when Child was 21 months old until he was 10 years old, Grandmother took care of Child's

---

[16] These facts distinguish this case from our recent decision in *Basciano v. Foster,* ___ Md. App. ___, No. 1978, Sept. Term, 2021, slip op. at 36 (filed Nov. 1, 2022), where we held that grandparents had not shown that they were *de facto* parents. In that case, the grandfather of a six-month-old child picked up the child after the Maryland Department of Human Services advised that the parents had overdosed on heroin. *Id.* at 3. The grandparents subsequently filed a complaint for custody, but Father objected, requesting that he have sole legal and physical custody of the child. *Id.* at 4. Although Father signed a temporary "Parenting Plan," he continued to argue that he should have custody. *Id.* at 4, 11. Because, unlike in this case, there was no consent to the establishment of a parent-like relationship, we concluded that the first prong of the *Conover* test was not satisfied. *Id.* at 36.

physical, educational, and psychological needs. Ms. Jackson testified that, for close to eight years, Grandmother fulfilled the role of Child's mother. Under these circumstances, Mother, Child's only legal parent, consented to a parent-like relationship between Grandmother and Child, even if she *subsequently* stated that she did not intend to consent to Grandmother having *de facto* parent status. The first factor of the *Conover* test was satisfied. The circuit court erred in finding to the contrary.[17]

In addition to consent to a parent-like relationship, there are three other factors that a court must consider in determining whether a third party has shown *de facto* parent status. Here, the court did not consider the other three factors in the four-factor test.

There is no challenge to two of the other factors. The second factor, i.e., that Grandmother and Child lived together in the same household, is not disputed and is clearly established by the evidence. Mother similarly does not dispute that the evidence showed that Grandmother was in a parental role for a sufficient time to establish a bonded parental-type relationship with Child.

---

[17] This conclusion is based on the unique facts of this case. It is not the case that, anytime a parent consents to a family member having temporary custody of their child, the first prong of the *Conover* test will be satisfied; that test requires consent for a parent-child relationship. Moreover, the fourth factor requires that the third party be in the parental role for a sufficient length of time to have established a bonded, parental-type relationship. Thus, in other circumstances where a parent leaves a child with a third party for short-term temporary care due to the need for help for some reason, such as an addiction problem, to accommodate work travel, or other situations, it is unlikely that a court would find *de facto* parent status. As indicated, parents should be encouraged to get help when they need it for their children. The *Conover* test establishes "a high bar for establishing *de facto* parent status." 450 Md. at 74. Merely seeking short-term, temporary care for a child does not, by itself, satisfy the strict test to establish *de facto* parent status.

Mother does argue, however, that Grandmother failed to satisfy the third factor of *Conover*, i.e., that Grandmother assumed the obligations of parenting Child without expectation of financial compensation. She argues that Grandmother failed to demonstrate that she contributed toward Child's support without expectation of financial compensation, noting that Grandmother inquired from Mother and her attorney how she could obtain money from life insurance policies and military benefits to care for Child.

Grandmother notes in her reply brief that the court failed to analyze this factor. She argues, however, that had it done so, the court would have found that she was a *de facto* parent.

The American Law Institute has discussed the *de facto* parenthood requirement that a person perform caretaking functions "for reasons primarily other than financial compensation." Principles of the Law of Family Dissolution: Analysis and Recommendations § 2:03(c)(ii) (Am. L. Inst. 2002) ("ALI Principles"). Comment (c) explains that the

> law grants parents responsibility for their children based, in part, on the assumption that they are motivated by love and loyalty, and thus are likely to act in the child's best interests. The same motivations cannot be assumed on the part of adults who have provided caretaking functions primarily for financial reasons.

ALI Principles § 2:03 cmt. c. Thus, the definition of *de facto* parent is intended to exclude "babysitters and other paid caretakers," as well as "foster parents . . . because of the financial compensation involved and because inclusion of foster parents would undermine the integrity of a state-run system designed to provide temporary, rather than indefinite, care for children." *Id.* Significantly, the comment states that the

50

> requirement that an individual have performed caretaking functions primarily for nonfinancial reasons does not rule out caretakers who may qualify for financial assistance to care for the child but whose caretaking role was not motivated primarily by that assistance. Thus, for example, family members who take children into their homes primarily out of family affinity may be *de facto* parents even if, as a result of taking a child into their home, they are able to qualify for welfare benefits, foster-care payments, or other forms of financial assistance.

*Id.*

In *In re Custody of A.F.J.*, 260 P.3d 889, 890–91 (Wash. Ct. App. 2011), the biological mother's partner took over caring for the mother's child conceived with an unknown father when the mother was using drugs. The State required the partner to become a licensed foster parent to continue caring for the child, which she did, and as a result, she began receiving financial compensation for the child. *Id.* at 891–92. The partner subsequently moved for a finding that she was the child's *de facto* parent. *Id.* at 892. After the trial court determined that the partner was a *de facto* parent, the mother appealed, arguing that a foster parent can never be afforded *de facto* parent status, and the partner's receipt of financial compensation to care for the child precluded her satisfaction of the *de facto* test. *Id.* at 892–93. Relying on the ALI Principles, the Court of Appeals of Washington rejected that argument, concluding that the partner took on care for the child out of family affinity, not because she would be compensated. *Id.* at 898–99.

Similarly, here, the evidence indicates that Grandmother took custody of Child out of family affinity, not for financial benefit. Her subsequent receipt of governmental benefits to which Child is entitled due to the death of Father does not change the analysis, particularly because Grandmother was Child's court-appointed guardian of property.

Given this, we hold that no reasonable factfinder could find, on these facts, that Grandmother took custody of Child for financial reasons. Accordingly, because each prong of the *Conover* test was satisfied, the court erred in finding that Grandmother had failed to show that she was a *de facto* parent.

On remand, the court shall engage in a new analysis of Child's best interest. Although the court did engage in a best-interests analysis, it did so on the premise that the analysis was one involving a legal parent and a third party. Because Grandmother has established that she is a *de facto* parent, however, she has the same status as Mother. *See David A.*, 242 Md. App. at 27 (once *de facto* parent status is shown, the *de facto* parent is "distinct from other third parties" and effectively is elevated to equal footing with legal parents for custody determination) (quoting *Conover*, 450 Md. at 85). The court must engage in a new best-interests analysis with Grandmother having the status of a legal parent, not that of a third party.

## II.

### Payment for Cost of Reunification Therapy and Visitation Supervision

Grandmother contends that, based on its finding that she was a mere third party, the circuit court lacked authority to order her to provide monetary support for Child, including splitting the cost of reunification therapy and the cost of supervised visitation exchanges. Mother disagrees, arguing that the court properly exercised its discretion in ordering Grandmother to pay the expenses during the period of transition from Grandmother's sole physical custody to Mother's sole physical custody. She further argues that, because Grandmother remained the court-appointed guardian of Child's property and the recipient

52

of approximately $4,000 per month in benefits on his behalf, Grandmother had an obligation to pay expenses incurred in Child's best interests during that time.

Because we are remanding this case for further proceedings, we will not address this issue. On remand, based on its decision, the court shall revisit this issue and explain its reasons for its assessment of costs.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED IN PART AND VACATED IN PART. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE SPLIT 50/50 BY THE PARTIES.**